Ann Fasulo *v.* Mehadin K. Arafeh, Superintendent, Connecticut Valley Hospital

Marie Barbieri *v.* Mehadin K. Arafeh, Superintendent, Connecticut Valley Hospital

House, C. J., Loiselle, Bogdanski, Longo and Speziale, Js.

474

Argued March 2—decision released September 20, 1977

*Terence Thatcher,* student intern, supervised by *Mary F. Keller,* with whom, on the brief, were *Stephen Wizner, Dennis E. Curtis,* and *Judith M. Mears,* for the appellants (plaintiff in each case).

*Carol A. Feinstein,* assistant attorney general, with whom were *Maurice Myron,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellee (defendant in each case).

LONGO, J. The plaintiffs, Ann Fasulo and Marie Barbieri, alleging that they were illegally confined by the defendant superintendent of the Connecticut Valley Hospital, a state-operated facility for mentally disordered adults, petitioned the Superior Court for writs of habeas corpus. The court dismissed the writs and the plaintiffs appealed.

Ann Fasulo was civilly committed to Connecticut Valley Hospital in 1951, as was Marie Barbieri in 1964. Both plaintiffs press two major claims in this appeal. First, they argue that since there is a requirement of periodic court review of the necessity for confinement of those individuals who have been acquitted of an offense on the grounds of

mental disease or defect, but not for persons like themselves who are civilly committed, their continued confinement violates the equal protection guarantee of article first, § 20, of the Connecticut constitution. They also claim that because their commitments are of indefinite duration and there is no procedure for periodic court review of the necessity for their confinement, their confinement is in violation of the due process guarantee of article first, § 8, of the Connecticut constitution.

We consider the plaintiffs' due process claim. Though the plaintiffs do not challenge their initial involuntary commitments, the due process safeguards incorporated into that procedure help to illuminate the plaintiffs' grievances. Among the important requirements of General Statutes § 17-178[1] are a judicial hearing initiated by the state at which the state bears the burden of proving that involuntary commitment is necessary, testimony by independent physicians who have recently examined the subject, and the rights to be represented by counsel, to present a defense and to cross-examine witnesses. Under General Statutes § 17-178 the necessity for confinement is to be determined according to a legal standard as a conclusion of law. The due process clause of the Connecticut constitution shares but is not limited by the content of its federal counterpart. *Roundhouse Construction Corporation* v. *Telesco Masons Supplies Co.*, 168 Conn. 371, 374, 362 A.2d 778. In *O'Connor* v. *Donaldson*, 422 U.S. 563, 580, 95 S. Ct. 2486, 45 L. Ed. 2d 396, Mr. Chief Justice Burger in a concurring opinion spoke of the process due a person civilly committed

[1] Section 17-178 is one of several statutes (§§ 17-176—17-206k) dealing with the general provisions for the commitment of mentally ill and drug dependent persons.

to a mental institution: "There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of 'iberty which the State cannot accomplish without due process of law. *Specht* v. *Patterson,* 386 U.S. 605, 608 [87 S. Ct. 1209, 18 L. Ed. 2d 326] (1967). Cf. *In re Gault,* 387 U.S. 1, 12–13 [87 S. Ct. 1428, 18 L. Ed. 2d 527] (1967). Commitment must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist. See *McNeil* v. *Director, Patuxent Institution,* 407 U.S. 245, 249–250 . . . [92 S. Ct. 2083, 32 L. Ed. 2d 719]; *Jackson* v. *Indiana,* 406 U.S. 715, 738 . . . [92 S. Ct. 1845, 32 L. Ed. 2d 435]."

As recognized by General Statutes § 17-178, the authority of the state to confine an individual is contingent upon the individual's present mental status, which must be one of mental illness amounting to a need for confinement for the individual's own welfare or the welfare of others or the community. See General Statutes § 17-176. The original involuntary commitment proceeding can only establish that the state may confine the individual at the time of the hearing and for the period during which the individual is subject to the requisite mental illness. As the United States Supreme Court has recognized, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which an individual is committed." *Jackson* v. *Indiana,* 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435. Once the purpose of the commitment no longer exists,

there is no constitutional basis for the state to continue to deprive the individual of his liberty. See *O'Connor* v. *Donaldson,* supra, 575. To satisfy due process, the procedure for releasing a civilly committed patient must be adequate to assure release of those who may no longer constitutionally be confined. Due process is a flexible concept, the content of which must be renewed each time it is used to measure the adequacy of challenged procedures. In general, "the thoroughness of the procedure by which [a] deprivation is effected must be balanced against the gravity of the potential loss and the interests at stake." *Hart Twin Volvo Corporation* v. *Commissioner of Motor Vehicles,* 165 Conn. 42, 45, 327 A.2d 588. It is significant to this case that the process afforded an individual must be "tailored to the capacities and circumstances of those who are to be heard." *Goldberg* v. *Kelly,* 397 U.S. 254, 268–69, 90 S. Ct. 1011, 25 L. Ed. 2d 287.

These plaintiffs have been deprived of their liberty. Their loss is already great, but can be initially justified as a result of the legitimate exercise of the parens patriae power of the state. The plaintiffs, however, have been committed indefinitely and confined for periods of twenty-six years and thirteen years respectively, thus requiring us to heed the warning of the United States Supreme Court that the longer the commitment, the greater the safeguards which are required to ensure that no one is deprived of liberty without due process. See *McNeil* v. *Director, Patuxent Institution,* 407 U.S. 245, 249–50, 92 S. Ct. 2083, 32 L. Ed. 2d 719. We must, therefore, review the plaintiffs' claims in light of the important interest at stake—liberty— and the great loss which its extended deprivation constitutes.

Any procedure to allow the release of involuntarily confined civilly committed individuals must take account of the controlled and often isolated environment of the mental hospital from which the confined individuals will seek release. It must calculate the possible incompetence of those confined, their limited knowledge of release procedures, the cost of pursuing review and the amount of effort necessary to pursue review. Further, the procedure must be adapted to the possible effect of drugs or other treatment on the patient's capacity and must be formulated with consideration of institutional pressures to rely on the *medical* judgments of the hospital staff rather than to pursue extrainstitutional *legal* remedies. See note, "Civil Commitment of the Mentally Ill," 87 Harv. L. Rev. 1190, 1398.

At present, Connecticut provides several routes by which a mental patient can challenge his confinement. General Statutes § 17-192 allows for release (1) by order of the Probate Court "upon application and satisfactory proof that such person has been restored to reason," or (2) "[i]f the officers, directors or trustees of a state hospital for mental illness are notified by the superintendent or other person in a managerial capacity of such institution that he has reason to believe that any person committed thereto by order of a probate court is not mentally ill or a suitable subject to be confined in such institution, such officers, directors or trustees may discharge such person." Under the second method the patient runs the risk of having his release prevented by a superintendent whose determination may later be found by a court to have been erroneous. See *O'Connor* v. *Donaldson,* supra; *McNeil* v. *Director, Patuxent Institution,* supra. Furthermore, the second procedure disregards the funda-

mental fact that the state's power legitimately to confine an individual is based on a legal determination under General Statutes § 17-178 "that the person complained of is mentally ill and dangerous to himself or herself or others or gravely disabled" and that the commitment shall only continue "for the period of the duration of such mental illness or until he or she is discharged in due course of law." The state's power to confine terminates when the patient's condition no longer meets the legal standard for commitment. Since the state's power to confine is measured by a legal standard, the expiration of the state's power can only be determined in a judicial proceeding which tests the patient's present mental status against the legal standard for confinement. That adjudication cannot be made by medical personnel unguided by the procedural safeguards which cushion the individual from an overzealous exercise of state power when the individual is first threatened with the deprivation of his liberty. See General Statutes § 17-178. In order to hold that judicial review of involuntary confinement is unnecessary, we would have to conclude either (1) that the procedural safeguards provided at the initial confinement hearing are not mandated by due process or (2) that subsequent deprivations of liberty are somehow constitutionally less serious and that the individual, therefore, can be confined with less process due. We reject both of these conclusions and hold that the due process clause of the Connecticut constitution mandates that involuntarily confined civilly committed individuals be granted periodic judicial reviews of the propriety of their continued confinement. We do not mean to suggest that a patient may not be released pursuant to the second procedure provided by General

Statutes § 17-192. Rather, we reject the argument that, standing alone, it is adequate to provide an involuntarily confined civilly committed individual with due process.

We also find the first method of release provided for in General Statutes § 17-192 constitutionally deficient. The method allows release of a patient after he has applied to the Probate Court for discharge and has proved that he has been "restored to reason." We find this procedure inadequate on two grounds. First, it places the burden of initiating review of his status on the patient, a requirement which suffers from conceptual as well as serious practical deficiencies. As we stated previously, since the state's power to confine is premised on the individual's present mental status, the original involuntary commitment proceeding can only establish that the state may confine the individual at the time of the hearing and for the foreseeable period during which that status is unlikely to change.[1] Upon the expiration of that period, the state's power to deprive the patient of his liberty lapses and any further confinement must be justified anew. The state, therefore, must bear the burden of initiating recommitment proceedings.

This same reasoning applies to the burden of proof at the recommitment hearing. The burden should not be placed on the civilly committed

[1] As the United States Supreme Court stated in *O'Connor* v. *Donaldson*, 422 U.S. 563, 574–75, 95 S. Ct. 2486, 45 L. Ed. 2d 396: "Nor is it enough that Donaldson's original confinement was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed." *Jackson* v. *Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435; *McNeil* v. *Director, Patuxent Institution*, 407 U.S. 245, 249–50, 92 S. Ct. 2083, 32 L. Ed. 2d 719.

patient to justify his right to liberty. Freedom from involuntary confinement for those who have committed no crime is the natural state of individuals in this country. The burden must be placed on the state to prove the necessity of stripping the citizen of one of his most fundamental rights, and the risk of error must rest on the state. Since the state has no greater right to confine a patient after the validity of the original commitment has expired than it does to commit him in the first place, the state must bear the burden of proving the necessity of recommitment, just as it bears the burden of proving the necessity for commitment.

Furthermore, to require a patient to initiate judicial review of his confinement and to bear the burden of proving the nonexistence of the necessity for that confinement ignores the practical considerations discussed above which are inherent in the mental patient's situation. Briefly, these include the difficulties of overcoming an isolated environment to initiate and coordinate a challenge to one's confinement. For instance, we cannot assume that friends and allies will always be available to secure counsel and marshal evidence on the patient's behalf. Nor can we assume that even if a patient is notified of his right to pursue any of the available remedies, he will be adequately protected. The state has suggested that the procedure provided in General Statutes § 17-178, as amended by section 3 (b) of 1976 Public Acts, No. 76-227, effective in March of 1977, met the constitutional arguments of the plaintiffs. That statute as amended is not now before us and we decline to rule prematurely on its provisions. We note, however, that many of the safeguards we have found necessary in this opinion are provided for in the new statute, par-

ticularly the right to a recommitment hearing with all the procedural safeguards of the initial commitment hearing at which the burden of proving the necessity for confinement rests on the state. Unfortunately, though the statute provides for annual notice to patients of their right to a hearing, the burden of requesting and, therefore, initiating review remains with the patient. The state seeks to justify this procedure by arguing that allowing the patient to choose whether to have a hearing will avoid unnecessary judicial proceedings. We doubt whether this rationale is adequate since it ignores the practical difficulties of requiring a mental patient to overcome the effects of his confinement, his closed environment, his possible incompetence and the debilitating effects of drugs or other treatment on his ability to make a decision which may amount to the waiver of his constitutional right to a review of his status. *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854; *Johnson* v. *Zerbst,* 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461.

The second method for release is contained in General Statutes § 17-178, which provides that a committing court "may, after hearing, when it finds it to be for the best interest of the person so committed, revoke such order of commitment." This is a discretionary provision with uncertain legal standards for its administration which cannot guarantee the accuracy and fairness of the determination and which cannot substitute for periodic judicial review of commitments.

Under General Statutes § 17-200, a patient may be discharged on the recommendation of a commission appointed by a Superior Court judge after

receiving information that a patient is illegally confined. This type of discretionary review, while potentially of benefit to the patient, cannot take the place of regular periodic review at which the patient will enjoy procedural safeguards guaranteeing an adequate review of his condition.

Finally, a patient may challenge the legality of his confinement through a writ of habeas corpus, pursuant to General Statutes § 17-201. This method of securing review falls short of the constitutional standard we have enunciated today since the burden of initiating review remains with the patient. We, therefore, conclude that the trial court erred in holding that the procedures presently available to these plaintiffs satisfy due process.

We, therefore, hold that these plaintiffs have been denied their due process rights under the Connecticut constitution by the state's failure to provide them with periodic judicial review of their commitments in the form of state-initiated recommitment hearings, replete with the safeguards of the initial commitment hearings, at which the state bears the burden of proving the necessity for their continued confinement.

Because of our disposition of the plaintiffs' due process claim, we find it unnecessary to reach their equal protection claims. *Ashwander* v. *Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S. Ct. 466, 80 L. Ed. 688 (concurring opinion of Brandeis, J.).

It is, therefore, ordered that the writs be granted and that the plaintiffs be afforded a hearing at which the state must justify their continued confinement.

There is error, and the case is remanded with direction to grant the writs in accordance with this opinion.

In this opinion SPEZIALE, J., concurred.

BOGDANSKI, J. (concurring). I agree that the present statutory scheme concerning the commitment and release of persons committed by civil process to an institution for the mentally ill is violative of the due process clause of our state constitution.

The questions presented in these proceedings are novel and unprecedented in this state. In the interests of justice they should be determined now as finally as it is possible. *Brownell* v. *Union & New Haven Trust Co.,* 143 Conn. 662, 672, 124 A.2d 901. I am compelled, therefore, to discuss the merits of the equal protection challenge as well and conclude that the present statutory scheme is violative of that constitutional clause also.

Few acts of the state impinge more directly and with greater finality on an individual's liberty than the act of the state in committing a person to involuntary confinement in a hospital for the mentally ill. Whether such commitment is made pursuant to civil or criminal proceedings, the ultimate effect is the same: the person loses not only his freedom, but also suffers the indignity of being treated while in confinement as something less than a normal reasoning human being.

The point sought to be stressed is twofold: first, that any involuntary commitment is a serious infringement on a person's right to liberty which should be tolerated only so long as is necessary, and second, that when any statutory scheme which significantly affects such a commitment is challenged as

violative of either the due process or equal protection clauses it ought to be subjected to "strict judicial scrutiny."

The plaintiffs, civilly committed pursuant to § 17-178 of the General Statutes, claim that they are deprived of equal protection of the law because of the denial to them of legal rights which are afforded to persons committed under § 53a-47 after having been found not guilty of a crime by reason of insanity. They assert that while the state has provided for a comprehensive follow-up procedure, including state-initiated automatic judicial reviews, with respect to the confinement and release of persons committed pursuant to § 53a-47, it has failed to provide for any similar procedure for the release of persons, such as themselves, committed pursuant to § 17-178.[1] They contend that, once the state has initiated action as parens patriae to commit involuntarily persons "for the period of the duration of such mental illness," it is incumbent on the state to provide for periodic judicial review on the factual and legal question as to whether that mental illness continues; that, in essence, the state has provided for such a review procedure for persons committed pursuant to § 53a-47, but not for them and for other persons similarly committed under § 17-178.

An examination of §§ 17-178 and 53a-47 reveals that they have the same intent and purpose: (a) both provide for restraint and custody while the

---

[1] There are currently several different statutes which authorize a civilly committed person to initiate court proceedings to obtain his liberty. See General Statutes §§ 17-192, 17-200, 17-201, and 17-229a. These statutes, however, in general, place the burden on the committed person and do not provide for any periodic review as to the duration of the mental illness.

proceedings are pending if the court is satisfied the individual is a dangerous person;[2] (b) both require medical examinations prior to the commitment hearing; (c) both provide for a hearing at which the court determines whether or not the person is mentally ill; (d) both authorize continued commitment of the individual only as long as he or she is mentally ill; (e) both statutes provide for the right of the mentally ill person to be represented by counsel at the commitment hearing.

There are, however, important differences in the rights accorded by the statutes concerning judicial review and release from confinement. Section 53a-47, which concerns commitment after a finding of not guilty because of insanity, requires the submission to the court of a written report every six months regarding that person's mental condition, and for a copy of that report to be sent to his lawyer. It further provides that the court, either upon its own motion or at the request of the parties, shall hold a hearing to determine whether such person should be released, and that such a court hearing must be initiated by the state at least once every five years. Most importantly, § 53a-47 requires that the state shall assume the burden of proof to show that such person's continued confinement is necessary.

By contrast a person civilly committed, pursuant to § 17-178, has no automatic access to the courts. Neither he nor his attorney is entitled to periodic

---

[2] The standard of "dangerousness" is relevant in civil commitment procedures only insofar as temporary confinement pending a full hearing is concerned. The standard applied by the court for purposes of final commitment determination is whether "the person complained of is mentally ill and a fit subject for treatment in a hospital for mental illness or that he ought to be confined . . . ." General Statutes § 17-178.

psychiatric reports, nor is he entitled to any state-initiated judicial review. Indeed, unless he or another interested party affirmatively seeks release from custody, he will never get one. In further contrast, if he should go to court and seek release from custody, he would have to establish before such court "satisfactory proof that . . . [he has] been restored to reason." See § 17-192 of the General Statutes. In point of fact, these plaintiffs have been confined for thirteen years and twenty-six years respectively, and neither has yet received any judicial review of her mental illness.

The equal protection clause of the Connecticut constitution requires that any classification affecting a fundamental right be subject to strict judicial scrutiny. *Horton* v. *Meskill,* 172 Conn. 615, 640, 376 A.2d 359. That constitutional provision provides in article first, § 20, that "[n]o person shall be denied the equal protection of the law . . . ." Article first, § 1, provides that "[a]ll men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." The equal protection provisions of the state and federal constitutions have the same meaning and impose similar constitutional limitations. *Horton* v. *Meskill,* supra, 639.

The equal protection clause does not prohibit a state from granting privileges to specified classes of persons where sufficient reasons exist; but where advantages are conferred upon some, the state must justify its denial to others by reference to a constitutionally recognized reason. *Thompson* v. *Shapiro,* 270 F. Sup. 331, 338 (D. Conn.), affirmed, 394 U. S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600; *Sanger* v. *Bridgeport,* 124 Conn. 183, 189, 198

A. 746. All such classifications "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *F. S. Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989.

To determine whether a statutory scheme violates the equal protection clause, a court must consider three factors: "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn* v. *Blumstein,* 405 U.S. 330, 335, 92 S. Ct. 995, 31 L. Ed. 2d 274. Where the "fundamental right" to education was involved, this court in *Horton* v. *Meskill,* supra, 649, declared that the interference with such a fundamental right requires "strict judicial scrutiny," which means that the state's action is not entitled to the usual presumption of validity. The state rather than the complainants must carry the "heavy burden of justification." *Dunn* v. *Blumstein,* supra, 343. It is insufficient to show that the classification is merely "reasonably related to a permissible state interest" or merely rational. Ibid.

The trial court's rationale for justifying the differences was the state's concern for public safety and the unique role of the insanity defense which requires criminal courts to remain apprised of the mental condition of the person committed after a finding of not guilty because of insanity. That rationale, however, cannot justify the disparate treatment.

In *Baxstrom* v. *Herold,* 383 U.S. 107, 86 S. Ct. 760, 15 L. Ed. 2d 620, the United States Supreme

Court invalidated commitment procedures for a mentally ill prisoner because those procedures were not the same as those accorded to all others. The court there (p. 111) said: "It follows that the State, having made this substantial review proceeding generally available on this [the commitment] issue, may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from . . . [others]." The court further stated: "Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all.*" (Emphasis in original.)

Another recent United States Supreme Court case, *Jackson* v. *Indiana,* 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435, is relevant. There, the court reviewed the procedure by which a mentally defective deaf-mute was committed after having been found incompetent to stand trial for robbery. In concluding that the procedures used violated the equal protection of the law under the fourteenth amendment, the court (p. 729) made the following observation: "*Baxstrom* did not deal with the standard for release, but its rationale is applicable here. The harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release."

Other courts have struck down on equal protection grounds commitment and release procedures which denied prisoners or persons acquitted by rea-

son of insanity the same rights as accorded to others. See *Chesney* v. *Adams,* 377 F. Sup. 887 (D. Conn.) (prisoner); *Cameron* v. *Mullen,* 387 F.2d 193 (D.C. Cir.) (acquittal by reason of insanity); *Bolton* v. *Harris,* 395 F.2d 642 (D.C. Cir.) (acquittal by reason of insanity); *United States ex rel. Schuster* v. *Herold,* 410 F.2d 1071 (2d Cir.) (prisoner).

Where the state is prohibited from denying equal rights with respect to commitment and release procedures to prisoners and persons acquitted by reason of insanity, it follows that it ought also to be prohibited from denying those same rights to persons who have committed no crimes. The burden of proof of the necessity for confinement of persons who have not been convicted of a crime should remain with the state at all times.

The state has utterly failed to show any justification for its disparate classification.

LOISELLE, J. (dissenting). It is crucial to remember that this is not an action for a declaratory judgment, but a habeas corpus proceeding. The plaintiffs alleged that they were confined pursuant to orders of the Middletown Probate Court issued in 1951 and 1964, and that their confinement was illegal because they had received no periodic review of the need for their confinement. The defendant's return admitted the first allegation and denied the second.

It is incumbent on one seeking a writ of habeas corpus to allege facts which show that he or she is illegally restrained. If the application does not set forth such facts, the court may dismiss it. *Mayock* v. *Superintendent, Norwich State Hospital,* 154 Conn. 704, 224 A.2d 544. The defendant may raise this objection by a motion to quash. Practice Book

§ 453. Such a motion is equivalent to a demurrer. *Adamsen* v. *Adamsen,* 151 Conn. 172, 175, 195 A.2d 418. Failure so to move, however, does not cure an insufficient application if no additional allegations are made at the hearing.

In their applications, the plaintiffs did not set forth any facts showing that the orders of the Middletown Probate Court were not still valid. The court found that those orders issued in accordance with § 17-178 of the General Statutes and its predecessor, § 2645 (1949 Rev.). Such commitments were authorized "while such mental illness continues or until . . . discharged in due course of law." The plaintiffs did not allege that their mental illness did not continue, or that they had been discharged in due course of law. Nor did they so allege at the hearing; the court specifically found that there was no claim that they were not dangerous or that they could survive safely in a free society. Neither did they allege that if they were to be accorded due process today, they would be entitled to be released. At oral argument, counsel made it clear that the absence of such an allegation is not a mere error of pleading. These petitions have been brought not to secure the plaintiffs' immediate release but to challenge Connecticut's statutory scheme for releasing them in the event that their mental condition improves at some future date.

The burden of proof of the necessity for the confinement of one who has not been convicted of a crime should remain on the state at all times. The failure of the plaintiffs to allege facts which showed that they were illegally confined, however, meant that they were not entitled to set in motion the machinery of the court. Had they alleged that, given

proper court review, they would be entitled to be released, the burden of proving the contrary would have been on the defendant.

Because the plaintiffs did not allege any facts which showed that the court orders under which they were committed were no longer valid, or that the lack of periodic court review caused their wrongful confinement, they did not make out a prima facie case of illegal confinement. The court was not in error in dismissing the applications.

In this dissenting opinion HOUSE, C. J., concurred.