Merrimack
No. 83-227
No. 82-572

THE STATE OF NEW HAMPSHIRE

v.

KEVIN BALLOU

July 31, 1984

306

[REDACTED]

*Gregory H. Smith*, attorney general (*Paul Barbadoro*, assistant attorney general, on the brief and orally), for the State.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendant.

PER CURIAM. These cases are before us on an interlocutory transfer without ruling from the Superior Court (*Cann*, J.). The sole

question before us that was briefed and argued is whether RSA 651:11-a, I (Supp. 1983), if applied to this defendant, would be an illegal retrospective or ex post facto law. We rule that RSA 651:11-a, I (Supp. 1983), if applied to this defendant and those similarly situated, would be a retrospective law violative of the New Hampshire Constitution, part I, article 23.

The operative facts are summarized from the agreed statement of facts in the interlocutory transfer. On June 4, 1980, the defendant was indicted on a charge of second-degree assault (RSA 631:2 (Supp. 1983)) alleged to have occurred on March 22, 1980. On October 22, 1980, the defendant entered a plea of not guilty by reason of insanity, and the plea was accepted by the Superior Court (*Contas*, J.). The defendant was subsequently committed to the New Hampshire State Hospital "for life until or unless earlier discharged, released, or transferred by due course of law." RSA 651:9 (Supp. 1983).

When the defendant entered his plea of not guilty by reason of insanity, RSA 651:11-a provided:

> "Orders of committal or transfers to the state hospital made pursuant to this chapter shall be valid for 2 years. For the order to be renewed, another judicial hearing must be held. At the renewal hearing, when the court is satisfied by a preponderance of the evidence that the hospital patient suffers from mental disease and that it would be dangerous for him to go at large, the court shall renew the order of committal or transfer."

Part of this statute had been found unconstitutional because it permitted recommittal based on a mere preponderance of the evidence, rather than based on proof beyond a reasonable doubt. *State v. Gregoire*, 118 N.H. 140, 384 A.2d 132 (1978).

Effective May 22, 1982, the legislature amended RSA 651:11-a to extend the validity of orders of committal from two to five years. After seeking our advice, the legislature revised the standard for recommitments to that of proof beyond a reasonable doubt. *See Opinion of the Justices*, 122 N.H. 199, 202, 442 A.2d 594, 596 (1982); RSA 651:11-a, I (Supp. 1983).

In August 1982, the State petitioned for the recommittal of the defendant to the New Hampshire Hospital. The defendant filed a motion *in limine* in which he contended that any recommittal order could not exceed two years because, if applied to him, RSA 651:11-a (Supp. 1983) would be an unconstitutional retrospective law in violation of the New Hampshire Constitution, part I, article 23, and an unconstitutional ex post facto law violative of the United States Con-

stitution, article I, section 10, clause 1. Why the motion was denominated *in limine* on these facts is unknown.

On November 18, 1982, the Superior Court (*Cann*, J.), after the so-called "*Gibbs*" hearing, found beyond a reasonable doubt that the defendant was "presently suffering from a mental disorder and that it [would] be dangerous for him to go at large." The court ordered the defendant recommitted to the New Hampshire Hospital, did not rule on the defendant's motion, and transferred to this court the questions raised in the motion.

In a separate appeal, that was consolidated with this case, the defendant challenged his recommittal based on the sufficiency of evidence and alleged evidentiary errors. These issues were not briefed or argued on appeal and therefore we will not address them. *See D. W. Clark Road Equipment, Inc. v. Murray Walter, Inc.*, 124 N.H. 281, 469 A.2d 1326 (1983).

 The New Hampshire Constitution forbids retrospective or ex post facto laws. "Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses." N.H. CONST. pt. I, art. 23. The policy underlying "this prohibition is to prevent the legislature from interfering with the expectations of persons as to the legal significance of their actions taken prior to the enactment of a law." *State v. Vashaw*, 113 N.H. 636, 637–38, 312 A.2d 692, 693 (1973). This court has reiterated on numerous occasions that this provision "prohibits the enactment of any law which 'creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions . . . already past . . . .'" *State v. Vashaw, supra* at 637, 312 A.2d at 693 (quoting *Pepin v. Beaulieu*, 102 N.H. 84, 89, 151 A.2d 230, 235 (1959) (quoting *Woart v. Winnick*, 3 N.H. 473, 479 (1826))).

In our most recent criminal case dealing with the ex post facto prohibition, we held that the defendant was not significantly deprived of a "meaningful opportunity to seek a suspension of his sentence" by the operation of a new statute that eliminated the unlimited right to seek a sentence suspension. *State v. Theodosopoulos*, 123 N.H. 287, 291, 461 A.2d 100, 103 (1983). In other words, the new statute did not create a "new disability." *State v. Vashaw supra.*

 We have stated that "ex post facto or retrospective laws are generally violative of both the U.S. Const. art. I, § 10 and the N.H. Const. pt. I, art. 23." *State v. Lambert*, 119 N.H. 881, 884, 409 A.2d 794, 796 (1979). This position is equally true today. Under the Federal Constitution, the ex post facto clause prohibits laws which

are "retrospective," and "disadvantage the offender." *Weaver v. Graham*, 450 U.S. 24, 29 (1981).

■ To the extent that *State v. Theodosopoulos supra* required a "substantial disadvantage," it falls short of the federal minimum required by *Weaver supra*. While the result in *Theodosopoulos* would be the same, we reaffirm that the test is merely "disadvantage." *See State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983) ("the role of the Federal Constitution is to provide the *minimum* level of national protection").

■ We apply the standards applicable in criminal matters to this case because we have repeatedly said that recommitments pursuant to RSA 651:11-a (Supp. 1983) are criminal proceedings. *See Opinion of the Justices*, 122 N.H. at 203, 42 A.2d at 595 (1982) ("reasonable doubt standard of proof was constitutionally required in criminal recommitment hearings."); *State v. Gregoire*, 118 N.H. 140, 142, 384 A.2d 132, 133 (1978) ("we held that in a criminal recommitment hearing"); *see also Proctor v. Butler*, 117 N.H. 927, 932, 380 A.2d 673, 676 (1977) (quoting *In re Miller*, 98 N.H. 107, 108–09, 95 A.2d 116, 117 (1953)) ("Due process of law is not to be circumvented by use of the term civil as applied to proceedings which may have the same effect as criminal proceedings"); *see generally State v. Paradis*, 123 N.H. 68, 455 A.2d 1070 (1983).

■ In *Novosel v. Helgemoe*, 118 N.H. 115, 119, 384 A.2d 124, 126 (1978), we recognized that "[t]he legislature clearly has in mind a separate class when criminal commitment is concerned." This legislative intent is further evinced by examining the statutory scheme applicable to insanity acquittees. The discharge, absences, parole, and hearings involving insanity acquittees are governed by RSA 135:28 to :30-a, while RSA 135-B:26 to :41 governs those civilly committed.

Prior to the discharge or granting of off-grounds privileges "to any person committed to the hospital by criminal proceedings, the superintendent shall give notice . . . to the superior court . . . and to the office of the prosecutor . . . ." RSA 135:28-a. The effect of this statute is that the *court* actually decides when the insanity acquittee may be released. *See* 2 R. McNamara, New Hampshire Practice, Criminal Practice and Procedure § 906 (1980). In contrast, RSA 135-B:39 (Supp. 1983) provides that those civilly committed may be discharged from treatment by the administrator of the hospital with the consent of a psychiatrist. Off-grounds privileges are not regulated at all by statute for civilly committed patients, but they are for the criminally insane.

The continued jurisdiction of the superior court over the insanity acquittee is illustrated by RSA 135:29: "On due cause shown, [the court may] parole any person committed to the hospital by criminal proceedings . . . ." There is, of course, no provision for the *parole* of those civilly committed because they are not criminally committed. *See* RSA 135-B:26 to :41.

In RSA 135:30-a, the conduct of hearings and the rights of insanity acquittees at those hearings are delineated, while the analogous provisions for persons civilly committed are set forth in RSA 135-B:26 to :41. At the present time, the forensic unit in which insanity acquittees are housed is a 41-bed facility located on the grounds of the New Hampshire Hospital. However, there are plans to construct a new forensic unit with 60 beds on the grounds of the State prison. The groundbreaking for the new unit is scheduled to take place in 1984, and occupancy is scheduled for the fall of 1985.

The dissent's reliance on *In re Moulton*, 96 N.H. 370, 77 A.2d 26 (1950) is misplaced. In *Moulton*, we held that proceedings involving dangerous sexual offenders were constitutional because they were civil as "section 1 specifically calls for 'a civil commitment.'" *Id.* at 373, 77 A.2d at 28. While proceedings pursuant to RSA chapter 173-A were not a part of the Criminal Code, that chapter has since been repealed and is thus irrelevant to our discussion. Laws 1983, 206:1.

■ With this background in mind, we now turn to the defendant's contention that RSA 651:11-a, I (Supp. 1983), as applied to him, is violative of the retrospective provision of the New Hampshire Constitution because it disadvantages him. Because we rule that RSA 651:11-a, I (Supp. 1983) violates the New Hampshire Constitution, part I, article 23, we do not reach the federal constitutional question. *See State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983).

The defendant was indicted in 1980, for a crime alleged to have occurred earlier that year, and in 1980 he pled not guilty by reason of insanity, and was committed to the New Hampshire Hospital. RSA 651:11-a, I (Supp. 1983), extending the validity of the commitment order from two to five years, was enacted in 1982. It is indisputable that, when applied to this defendant, RSA 651:11-a, I (Supp. 1983) is a retrospective law.

■ The sole question presented for our determination, therefore, is whether the actual *operation* of RSA 651:11-a, I (Supp. 1983) disadvantages the defendant. *See State v. Theodosopoulos, supra* at 290, 461 A.2d at 102. The State contends that RSA 651:11-a, I (Supp. 1983) does not disadvantage the defendant because he can petition the court to review his commitment status at any time, *see* RSA

135:28, :29, or :30-a, and because the burden of proof is merely procedural, thus not affecting a substantive right. We cannot agree with the State's position, for two reasons: RSA 651:11-a, I (Supp. 1983) implicitly places the *burden of petitioning* the court for a hearing *and* the *burden of proof* on the defendant, should he request a hearing sooner than the five years provided for by the statute. These distinct additional burdens both disadvantage the defendant.

When the State petitions to commit or recommit a defendant under RSA 651:11-a, I (Supp. 1983), the State must initiate the proceedings, and the defendant is guaranteed legal representation in accordance with New Hampshire Superior Court Administrative Rule 11-7. When a defendant seeks to have his commitment status reviewed under RSA 135:28, :29, or :30-a, he must initiate the proceedings and legal representation is *not* provided. *See* SUPER. CT. ADMIN. RULES 11-1 to 11-5; *see also* 2 R. MCNAMARA, NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 906 (1980). To fail to recognize that this distinction places the defendant at a disadvantage would be to overlook the practical realities of the institutional life of a mental patient. *See* Note, *Substantive Due Process Limits On The Duration of Civil Commitment For the Treatment of Mental Illness*, 16 HARV. C.R.-C.L. L. REV. 205, 219–23 (1981) (hereinafter Harvard Note).

The Connecticut Supreme Court recently addressed this issue as applied to civilly committed patients and found that the procedure was inadequate because it placed the burden of initiating review on the patient. *Fasulo v. Arafeh*, 173 Conn. 473, 480, 378 A.2d 553, 556 (1977). The court stated that

> "to require a patient to initiate judicial review of his confinement and to bear the burden of proving the nonexistence of the necessity for that confinement ignores the practical considerations discussed above which are inherent in the mental patient's situation. Briefly, these include the difficulties of overcoming an isolated environment to initiate and coordinate a challenge to one's confinement. For instance, we cannot assume that friends and allies will always be available to secure counsel and marshal evidence on the patient's behalf."

*Id.* at 481, 378 A.2d at 557. *See* Harvard Note, *supra* at 221. The State of Connecticut attempted to justify the procedure of requiring the patient to initiate judicial review on the ground that it would "avoid unnecessary judicial proceedings." *Id.* at 482, 378 A.2d at 557. The court responded to this argument stating:

> "We doubt whether this rationale is adequate since it ignores the practical difficulties of requiring a mental patient to overcome the effects of his confinement, his closed environment, his possible incompetence and the debilitating effects of drugs or other treatment on his ability to make a decision which may amount to the waiver of his constitutional right to a review of his status."

*Id. See generally* Harvard Note *supra.*

 This reasoning of the Connecticut Supreme Court appears well founded to us. We rule, therefore, that a disadvantage is created by a procedure which shifts the burden of initiating judicial review of commitment status, for those who were committed prior to the enactment of RSA 651:11-a (Supp. 1983), and who desire review of their commitment status more frequently than the five-year review provided for now. *Id.*

 The State also argues that RSA 651:11-a, I (Supp. 1983) is not an unconstitutional retrospective law because it is merely a procedural change. At the five-year recommitment hearing, RSA 651:11-a, I (Supp. 1983) places the burden of proof beyond a reasonable doubt on the State. When a defendant desires review of his commitment status prior to the expiration of the five- or two-year period, he must initiate the review and he bears the burden of proof by a preponderance of the evidence. *See State v. Hesse*, 117 N.H. 329, 331, 373 A.2d 345, 346 (1977); *see also* 2 R. MCNAMARA, NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 906 (1980). The State contends that this shifting of the burden of proof does not disadvantage the defendant. We do not agree.

This court has repeatedly recognized the significance of the different burdens of proof and their effect on the party on whom they are cast. This is especially true in proceedings involving the commitment of mentally ill persons, "[b]ecause the consequences of erroneous confinement are so serious, this court adopted a 'beyond a reasonable doubt' standard." *Opinion of the Justices*, 122 N.H. 199, 202, 442 A.2d 594, 595 (1982). The rationale underlying our adoption of this stringent standard in part was "the speculative nature of psychiatric diagnosis and prognosis and the conflicting opinions of psychiatric experts." *Id.*

In *State v. Gregoire*, 118 N.H. 140, 384 A.2d 132 (1978), we stated that "[w]e required the higher standard of proof in both *Gibbs v. Helgemoe* and *Proctor v. Butler* not only because of the vital interest in liberty, but also because of the established fact that psychiatric opinions are far from infallible." *Id.* at 143, 384 A.2d at 133. "Only

by raising a high standard, *i.e.*, one that excludes confinement in cases of reasonable doubt, can the risk of erroneous recommitment be reduced and the liberty guaranteed by N.H. CONST. pt. I, art. 15, be protected and assured." *Id.* at 143–44, 384 A.2d at 134. Finally, in *Gibbs v. Helgemoe*, 116 N.H. 825, 367 A.2d 1041 (1976), we said that the "[e]ssential elements in a commitment hearing are the nature of the burden of proof and on whom it is imposed." *Id.* at 828, 367 A.2d at 1043.

Today we are asked by the State to rule that RSA 651:11-a, I (Supp. 1983) as applied to this defendant is not a retrospective law. To do this, we would have to rule that shifting the burden of proof from the State to the defendant, when the defendant seeks a more frequent review of his commitment status than now provided for by RSA 651:11-a, I (Supp. 1983), does not disadvantage the defendant. An opinion consistent with this position would, of necessity, significantly downgrade the importance and impact of the burden of proof in hearings for the commitment and recommitment of the mentally ill which we have held in our prior decisions to be essential. In order to remain consistent with *Gibbs v. Helgemoe supra*, and its progeny, and to reaffirm our belief in the importance of the burden of proof, we decline to rule as the State requests.

*Remanded.*

SOUTER, J., and BROCK, J., dissented in part.

SOUTER, J., dissenting in part: I respectfully dissent from that portion of the majority opinion which holds that the recommitment of this defendant for a period of five years would be unconstitutional as an ex post facto application of the most recent amendment of RSA 651:11-a (Supp. 1983).

To explain my disagreement, I begin with a consideration of the earlier proceedings in the case. In 1980, the defendant pleaded not guilty by reason of insanity to an indictment charging that he had committed the criminal offense of second-degree assault that same year. *See* RSA 631:2 (Supp. 1983). The State and the superior court accepted his plea under RSA 651:8-a (Supp. 1983).

The acceptance of the plea established that the defendant had been insane at the time he committed the acts charged in the indictment and, for that reason, was not guilty of committing the criminal offense of second-degree assault. *See id.* The acceptance of the plea did not, however, authorize the court or the State to commit the defendant to an institution in derogation of his liberty. Rather, under the law then and now, the defendant was entitled to be released unless a hearing was held to determine his present mental

condition, and unless the State then proved beyond a reasonable doubt that the defendant would be dangerous if allowed to go at large. RSA 651:9 (Supp. 1983). It is crucial to recognize that the issue at such a hearing is not whether the defendant had been insane in the past; that legal conclusion has already been established. Nor is the issue whether the defendant had been dangerous at any time in the past, however relevant that may be in determining how he will probably act in the future. The issue, and the only issue, is whether at the time of the hearing he is and will remain dangerous. RSA 651:9 (Supp. 1983).

In the present case, the court held an evidentiary hearing to determine the defendant's mental condition at that time. It found beyond a reasonable doubt that at the time of the hearing the defendant's mental condition was such that it would be dangerous for him to go at large. It therefore committed him to the New Hampshire Hospital under RSA 651:9 (Supp. 1983). As it read in 1980, RSA 651:11-a (Supp. 1983) limited the commitment to a period of two years. If a court had not modified its order and released the defendant during those two years, on their expiration the State was required either to release the defendant or to prove beyond a reasonable doubt that his mental condition would still make it dangerous for him to go at large. If the State did prove that, the statute authorized a recommitment for a further period of two years. *Id.*

In this case, during the two-year period of the defendant's original commitment, the legislature amended RSA 651:11-a (Supp. 1983) to increase the maximum duration of a commitment from two years to five. Laws 1982, 34:2. The amendment did not purport to increase the maximum length of any orders of commitment issued before its effective date. It simply authorized commitments after the effective date of the amendment to be as long as five years. The amendment took effect before the defendant's original two-year commitment had expired.

When that original commitment did expire, the court held a new evidentiary hearing. The State presented evidence about the defendant's mental condition at the time of the hearing, after which the court found beyond a reasonable doubt that the condition was still such that the defendant would be dangerous if at large. The court therefore recommitted the defendant for a further period but transferred to us the pending question about its permissible duration. The State claims the amendment should be applied to authorize a recommitment for up to five years. The defendant claims that part I, article 23 of the Constitution of New Hampshire precludes recommitment for more than the two-year period provided by the

law at the time he committed the underlying acts and at the time of his plea.

To decide between these two positions, we must start with the laconic provisions of article 23:

> "Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses."

While the article does not define its principal term, retrospective, it does describe two categories of laws that may be retrospective, as "laws . . . for the decision of civil causes" or cases, and laws for "the punishment of offenses." The decisions that have interpreted the article have followed the same distinction, and to understand the article's prohibition, we really must consider two separate categories of retrospectivity.

The early leading case of *Woart v. Winnick*, 3 N.H. 473 (1826) established the doctrinal distinction between these categories by first considering the characteristics that would make a law for "the punishment of offenses" retrospective. The court did this by equating that kind of penal retrospective law with what article I, section 10 of the National Constitution also prohibits under the name of an ex post facto law. Following this early case, when we speak of the application of article 23 to laws for "the punishment of offenses," we commonly speak of it simply as forbidding ex post facto laws, or ex post facto applications of laws, even though article 23 does not use that Latin term.

The court in *Woart* described a prohibited ex post facto law, or ex post facto application of a law, by paraphrasing language from the earlier federal case of *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798), which had construed the federal clause:

> "Every law, which makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; or which aggravates a crime, and makes it greater, than it was when committed; or which changes the punishment, and inflicts greater punishment, than the law annexed to the crime when committed; or which alters the legal rules of evidence, and receives less or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender is an *ex post facto* law."

*Woart v. Winnick, supra* at 475.

The identity of the State and national provisions in the context of penal laws, and the content of those provisions, remain today essen-

tially as the court described them in *Woart. See State v. Theodoso-poulos*, 123 N.H. 287, 461 A.2d 100 (1983); *State v. Breest*, 116 N.H. 734, 367 A.2d 1320 (1976); *Rich v. Flanders*, 39 N.H. 304 (1859); *Weaver v. Graham*, 450 U.S. 24 (1980).

The court in *Woart* then turned to the application of the article to laws for deciding "civil causes," by quoting Mr. Justice Story, in another earlier federal case that had applied article 23:

> "'[E]very statute, which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective' . . . ."

*Woart v. Winnick, supra* at 479 (quoting *Society v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H. (1814) (No. 13,156))).

These two extended quotations are the sources of the distinction between the penal and civil applications of article 23 that has persisted and increased in breadth to this day. While the application of the article to laws for the "punishment of offenses" has not changed significantly over the years, its application to laws for deciding civil cases has undergone continual development. In the civil sphere, the rule has come to be that a retrospective law is not absolutely unconstitutional, but may be applied if some public benefit can be shown to outweigh the injury said to flow from retrospective application. *Compare Estate of Kennett v. State*, 115 N.H. 50, 333 A.2d 452 (1975), *and Hayes v. LeBlanc*, 114 N.H. 141, 316 A.2d 196 (1974), *with Smith Insurance, Inc. v. Grievance Committee*, 120 N.H. 856, 424 A.2d 816 (1980), *and Geldhof v. Penwood Associates*, 119 N.H. 754, 407 A.2d 822 (1979).

Such distinctions between the consequences of retrospectivity in the penal and civil spheres should not concern us in this case, however, unless the application of the statute as amended would be either ex post facto or retrospective. It would not be either one.

In considering, first, whether the application of the amendment would be ex post facto in the context of the present case, we must determine whether the law as amended is one for "the punishment of offenses." That issue turns on whether the application of the amendment would fall within any of the categories described in *Calder v. Bull*, 3 U.S. (3 Dall.) at 390, as paraphrased in *Woart v. Winnick*, 3 N.H. at 475. There does not appear to be any basis to argue that the amendment provides for the punishment of a new crime, or that it alters any rules of evidence bearing on proof of guilt, or that it aggravates the criminal character of any prior offense, as distinguished from its penalty.

Under the rule in *Calder*, all that remains is the possibility of arguing that the amendment would inflict a greater punishment for the crime or offense than the law imposed when the defendant committed the offense. This argument would fail. The amendment would be applied to this defendant on the same grounds that the earlier two-year provision may be applied. Under either provision there is no "offense" that justifies commitment. Only proof of dangerousness can justify commitment, and a commitment on grounds of dangerousness is not punishment. *Jones v. United States*, 103 S. Ct. 3043 (1983).

It is clear right on the face of the commitment statute that it applies not to those who have committed an offense, but to those who have been found to be still dangerous following an insanity plea. RSA 651:9 (Supp. 1983). It is not an offense to be dangerous, and the finding of insanity eliminated the possibility that the acts charged in the indictment could constitute a criminal offense. As the earlier discussion indicated, a plea of not guilty by reason of insanity is a plea in confession and avoidance, and its acceptance is inconsistent with criminal liability. *Novosel v. Helgemoe*, 118 N.H. 115, 384 A.2d 124 (1978). Thus, a statute regulating commitments of dangerous defendants following findings of insanity does not deal with criminal offenses and, by definition, could not do so.

Nor would the commitment be "punishment" within the meaning of article 23 or *Calder v. Bull supra*. The duration of any such commitment is not limited to the period of imprisonment provided by the statute for those who are criminally liable for committing such acts, and no such commitment of any duration can be authorized merely on the basis of the defendant's acts as charged in the original indictment. On the contrary, this defendant can be recommitted on one condition only, that there is no reasonable doubt that his mental condition at the time of recommitment would make it dangerous for him to be at large. Such a commitment is imposed for the sake of safety, not for sake of penal policy, and its duration is limited to the duration of the dangerous condition that justifies it in the first instance.

If, for constitutional purposes, such a commitment were a punishment for an offense, then the majority would have to do more than they purport to do in deciding this case, for every civil involuntary commitment under RSA 135-B:37 based on "likelihood of danger" as defined in RSA 135-B:26 would equally be a punishment for an offense. It would then be necessary to overrule *State v. Hudson*, 121 N.H. 61, 425 A.2d 255 (1981), which held that an involuntary civil commitment cannot give rise to a double jeopardy claim.

In summary, there is no offense because the defendant has been found to be insane. There is no punishment because the defendant is committed for the sole reason that he is dangerous at a time after the time he did the acts charged in the indictment and after the date of the enactment of the statutory amendment in question. As a majority of the Supreme Court of the United States held in *Jones v. United States*, 103 S. Ct. 3043, 3052 (1983), "[a]s he was not convicted, he may not be punished." The application of the enactment cannot, therefore, be ex post facto under the State or the National Constitutions.

The majority seek to avoid this analysis by their conclusion that "recommitments pursuant to RSA 651:11-a (Supp. 1983) are criminal proceedings. *See Opinion of the Justices*, 122 N.H. at 203, 442 A.2d at 595 (1982) ('reasonable doubt standard of proof was constitutionally required in criminal recommitment proceedings.')" One may agree that in and out of court we commonly use the word "criminal" to describe both the insanity of defendants in insanity cases and the proceedings in question. One may agree, too, that the administrative provisions governing commitment and release of such defendants are different in some respects from those that govern the "civil" sphere.

Considering all of this, the majority position remains insufficient to sustain its conclusion, simply because nothing turns under the ex post facto aspect of article 23 on the mere fact that the proceedings may in some sense be labelled as "criminal." But everything turns on whether the law being applied is a law for the punishment of an offense. Because this law is not, the majority are wrong to conclude that its application can be ex post facto. Indeed, the position taken by the majority runs counter to virtually all cases from other jurisdictions that have considered the application of the ex post facto prohibition in circumstances analogous to the present one. *See People v. Buttes*, 184 Cal. Rptr. 497 (Cal. App. 1982); *People v. Valdez*, 79 Ill. 2d 74, 402 N.E.2d 187 (1980); *People v. Thiem*, 82 Ill. App. 3d 956, 403 N.E. 647 (1980); *In re Clark*, 86 Kan. 539, 121 P. 492 (1912); *Matter of Rogers*, 63 N.C. App. 705, 306 S.E.2d 510, *appeal dismissed*, 309 N.C. 633, 308 S.E.2d 716 (1983); *State v. Jackson*, 2 Ohio App. 3d 11, 440 N.E.2d 1199 (1981); *Matter of Guardianship of Nelson*, 98 Wis. 2d 261, 296 N.W.2d 736 (1980); *contra Raimondo v. Pavkovic*, 107 Ill. App. 3d 226, 437 N.E.2d 712 (1982) (holding of intermediate appellate court of Illinois inconsistent with holding of Supreme Court of Illinois in *People v. Valdez supra*); *see People v. Tedford*, 109 Ill. App. 3d 195, 440 N.E.2d 329 (1982).

Though the majority have erred in finding the proposed application of the amendment to be ex post facto, the question remains

whether it would be retrospective as falling within any of the categories of retrospective applications laws for deciding "civil causes." Would it impair any "vested right" of the defendant "or attach . . . a new disability, in respect to transactions or considerations already past"?

We must approach the answers to these questions by recognizing that there is no existing rule of statute or common law giving the defendant a vested right in the continuance of the earlier statutory provision regulating the length of commitment for dangerousness. Outside the sphere of the ex post facto, generally no one has a vested right to the continuance of prior law. *Farnum's Petition*, 51 N.H. 376 (1871).

Any vested right must flow, then, from the circumstances of this defendant's relationship to the State. Perhaps his most persuasive argument on its face would be that he had relied on the rule in *State v. Goodrich*, 116 N.H. 477, 363 A.2d 425 (1976), as guaranteeing the continuation of the conditions he expected when he entered his plea of not guilty by reason of insanity. That case held that a defendant may withdraw a plea of guilty when the court declines to follow the State's recommendation made in accordance with a plea agreement.

The attempted analogy with *Goodrich* will not hold up, however. In this case there is no record of a plea agreement with terms relating to the disposition of the defendant. There was only an agreement that the State would accept a plea that would relieve the defendant of the possibility of criminal liability. Since the defendant was not a party to any agreement about disposition, there is no basis to elevate his hope or expectation to the level of a right that deserves to be treated on equitable grounds as vested. Were there any doubt on this issue, I believe that a full exposition of the competing concerns involved would support a ruling against the defendant on grounds of paramount public interest under *Estate of Kennett v. State*, 115 N.H. 50, 333 A.2d 452 (1975), and *Hayes v. LeBlanc*, 114 N.H. 141, 316 A.2d 187 (1974).

The only arguable possibility remaining for finding retrospectivity under the *Woart* tests for "civil causes" lies in the category of disabilities imposed "in respect to transactions or considerations already past." Would the extended period of commitment be ordered on the basis of transactions or considerations antedating the amendment? It clearly would not be.

As I have noted before, no recommitment, be it for five years or two years, may be justified except on the basis of a finding beyond a reasonable doubt about the defendant's dangerous condition at the time the court orders the recommitment. It is not enough that the defendant did certain acts in the past, or that he was dangerous in

the past. He may not, in other words, be committed for a past "transaction" or "consideration." Rather, he must be found to be dangerous at the time of recommitment, and that time is after the enactment of the statute, not before it.

The only conceivable basis for arguing that application of the amended statute would authorize a longer commitment based on "past transactions or considerations" would be a claim that article 23 forbids the consideration of behavior before the statutory change as evidence of dangerousness after the statutory change. However, when the use of evidence antedating the statutory enactment is not alone sufficient to impose a post-enactment burden, its use has never been held to be an example of retrospectivity.

Indeed, *In re Moulton*, 96 N.H. 370, 77 A.2d 26 (1950), rejected the argument that article 23 precluded the petitioner's commitment as a sexual psychopath based on evidence of acts committed before the sexual psychopath statute was enacted by Laws 1949, chapter 314. Indeed, the only evidence specifically described in that opinion was evidence of pre-statutory activity. Justice Kenison wrote for the unanimous court that the provision under which the defendant was committed "is not retrospective merely because it considers the past history of the person involved. The determination in 1950 that he was a sexual psychopath in 1950 is not made retrospective in its operation because the examining board and the court considered his life history prior to the passage of its act." *Id.* at 374, 77 A.2d at 29.

Nothing in the record before us distinguishes this case from *Moulton*. In each case a statute has authorized a commitment that was not authorized by prior law. In *Moulton* the commitment had not been authorized at all; here it was not authorized beyond two years. In each case the commitment has been authorized on the basis of a finding about the subject's condition at a time after the enactment of the new law. In each case the court has based the finding in part on evidence of facts existing before enactment of the new law. In each case some of the evidence has been furnished by the subject himself before enactment of the new law: in *Moulton* by a guilty plea to a prior offense, in this case by a plea of not guilty by reason of insanity, which admitted the acts charged in the indictment.

Despite these points of identity, the majority seek to distinguish *Moulton* on two grounds. They say it upheld the application of a statute that has since been repealed. But the question should be, has article 23 been repealed or amended since *Moulton*. They say the statute in *Moulton* authorized a "civil" commitment, as indeed it did. But *Moulton* lost his liberty just as surely as the present defendant has lost his, and for essentially the same reason. The majority ignores this by suggesting that constitutional distinctions should

turn on statutory or colloquial labels like "civil" or "criminal" rather than on the realities of liberty and basis for its loss. In the past this court has rejected such an approach, *Proctor v. Butler*, 117 N.H. 927, 380 A.2d 673 (1977), and we should reject it now.

*Moulton* simply recognized what is apparent in the present case, that the challenged commitment must rest on a post-enactment finding of post-enactment dangerousness. The application of such an enactment as the present amendment is therefore not retrospective, and article 23 does not forbid a recommitment for as long as five years.

BROCK, J., concurs in the dissent.