# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2631-17T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

C.M.,

    Defendant-Appellant.

_____

Submitted November 14, 2018 – Decided April 26, 2019

Before Judges Ostrer and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 85-08-0817.

Joseph E. Krakora, Public Defender, attorney for appellant (Claude Caroline Heffron, Assistant Deputy Public Defender, of counsel and on the briefs).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Erica M. Bertuzzi, Assistant Prosecutor, on the brief).

PER CURIAM

The trial court denied C.M.'s motion for release from civil commitment after a periodic <u>Krol</u> hearing.  <u>See</u> <u>State v. Krol</u>, 68 N.J. 236 (1975).  Because the trial judge did not conduct the requisite fact-finding, apparently failed to consider the full record, and shifted the burden to C.M., we remand for reconsideration of the entire record under the appropriate legal standard.

I.

C.M., who has schizoaffective disorder, major depressive disorder, and borderline intellectual functioning, stabbed his mother to death in 1983 while under sway of auditory hallucinations.  Though he was on antipsychotic medication following a suicide attempt and hospitalization a year earlier, he reportedly did not comply with his medication regimen and did not inform his mother when he ran out of medication.  He was indicted in August 1985, found not guilty by reason of insanity two years later, and committed to a state psychiatric hospital.  He was transferred to Ancora Psychiatric Hospital in June 1993, where he has remained for the last twenty-five years.

C.M. has made steady progress at Ancora.  He apparently has not attempted violence against himself or others since 1983.[1]  He has spent a large

---

[1]  The record reflects that C.M. attempted suicide by swallowing prescription medication, bleach, razor blades, and rat poison, but these attempts apparently occurred in 1983 or earlier.

portion of his time on Level III supervision, the second least restrictive status for confined patients. See N.J.A.C. 10:36-1.3 to -1.8 (describing the four levels of supervision and procedures for determining the level appropriate for a committed patient).

Generally, C.M.'s understanding of his illness and dangerousness when in the throes of psychosis has improved. Earlier in his commitment, C.M. clearly lacked insight into his condition – prompting his treatment team to administer his medication by injection to avoid his discarding capsules. But since 2007, he has evinced, at least at times, a deeper realization of his need for medication. He stated in 2007 that he would "likely be dead" had he not been hospitalized. In 2008, he was reported "free of assaultive behaviors." His progress reports state that he handles conflicts with peers "quite well" and that he participated successfully in several supervised trips out of the hospital. He has had "excellent attendance" at his treatment programs and successfully completed a substance abuse program in late 2006.

Nonetheless, in 2007, staff became concerned that while C.M. "appeared to say the right thing about medications," when probed further he lacked real insight into his illness. They continued to medicate him in liquid form. In 2009,

A-2631-17T3

after staff discovered he had been vomiting one oral medication, they confronted and counseled him about complying with his medication.

Occasionally over the years, C.M. has also demonstrated poor judgment by possessing or selling coffee or cigarettes, which are contraband in Ancora. He was caught or suspected of contraband infractions four times between 2004 and 2010. After his first infraction, he was placed under "periodic visual observation," apparently for a few months; in late 2004 he was reinstated to Level III status with the approval of the Special Status Patient Review Committee (SSPRC), an internal reviewing body at Ancora. See N.J.A.C. 10:36-2.2. The SSPRC is comprised of the hospital's Clinical Director or Chief of Psychiatry, and directors of psychology, and nursing, rehabilitation, and social services. Ibid. It makes recommendations based on its own independent review of patient records and the treatment team's conclusions. See N.J.A.C. 10:36-2.3(e).

In January 2010, C.M. refused a request to transport contraband coffee. The SSPRC recommended C.M. for Level IV supervision, permitting him more independence and possible passes to visit his sister for a day at a time. See N.J.A.C. 10:36-1.8(a) ("Patients at Level of Supervision IV are those who pose no or minimal risk of harm to self, others or property and who may be discharged

A-2631-17T3

upon finalization of after-care and housing plans."). The SSPRC also recommended that C.M. participate in a twice-weekly "community partial care program," and that the trial court authorize his discharge planning subject to the approval of two independent psychiatrists. See N.J.A.C. 10:36-1.8(d) ("Most often, community-based programs and activities (for example, transitional programs, community day programs, community trips), as well as larger group activities, shall be part of the individual's overall program at Level IV.").

However, at his Krol hearing in 2010, the trial judge expressed concern about C.M. vomiting his medication and ordered he remain at Ancora. Upon finding coffee in C.M.'s possession in May 2010, staff became further concerned about the appropriateness of discharge and downgraded him to Level I supervision, the most restrictive status, reinstating him to Level III approximately a month later. C.M.'s doctor opined that C.M.'s low intellectual functioning made "it relatively easy for him to be exploited and used as a mule to carry cigarettes and coffee."

Yet, C.M. improved; his progress notes state that, as of June 2010, he was no longer delusional. From mid-2010 through 2012, C.M.'s treatment team reported he was increasingly "[i]nsightful into his index offense and the role psychiatric illness played." In his own words, C.M. regularly acknowledged his

medication kept him from "being suicidal or homicidal"; that his "diagnosis is paranoid schizophrenia and I have to be on medication for life"; and that he "must take [medication] for the rest of my life, otherwise I might hurt others and I don't want that to happen no more. I want to get on with my life." C.M. also recognized that his lapse in taking his medication had caused him to kill his mother; he described the incident and his state of mind in detail to his treating psychiatrist.

Noting his improvement, C.M.'s treatment team referred him to the SSPRC in October 2011 to evaluate his readiness for a group home. The SSPRC referred C.M.'s case to the Clinical Assessment Review Panel (CARP), an independent central reviewing committee, which approved "discharge planning to a 24/7 supervised setting" and recommended "securing evaluations of two independent psychiatrists per court order" and seeking the court's permission for off-site visits "as part of the discharge planning."

C.M.'s progress notes from 2012 document both a steady compliance with his medication regimen and his psychiatrist's efforts to find him a suitable group home. In January 2012, C.M. was "[d]oing very well" and was "[i]nsightful and compliant with medications [and] programming." In June 2012, his psychiatrist noted he had contacted a group home, and that if the home would accept C.M.,

6

Ancora would begin the discharge process. However, while the group home provisionally stated C.M. met its criteria, it had no vacancy. Approaching the end of 2012, C.M. continued to acknowledge his need for medication.

However, in March 2013, C.M.'s treatment team learned from his peer that C.M. "has all along been serving as a mule delivering coffee on to the unit." The next month, he was caught with coffee and cigarettes, resulting in his placement under Level II supervision. While C.M. showed remorse, admitting his actions "showed poor judgment," his treatment team was concerned about his "compliance under minimal supervision." Though he continued to comply with his medication and treatment programs, his team deemed him unready for discharge, insisting on a twelve-month period without reportable incident as a prerequisite for discharge planning. C.M. again caused concern when staff learned in October 2014 that he had been smoking for the previous three weeks against his unit's policy, for which he was counseled and placed under closer monitoring.

After meeting with C.M., Ancora's addiction staff informed C.M.'s treating psychiatrist that C.M. was attempting to "sabotage[] discharge plans" through his infractions because he had become "institutionalized and may subconsciously not be able to cope with discharge planning." His progress notes

from May to September 2015 conclude with the following observation of C.M.'s overall progress:

> The client has remained for the most part without overt symptoms of his mental illness.  In other words, no overt psychosis, denies perceptual disturbance nor issues with medication adherence.  However he still has baseline issues with executive dysfunction . . . [which] can manifest themselves in a myriad of ways but in particular . . . poor ability to recognize the future consequences of action today and the ability to curtail impulses.

As of July 2015, C.M.'s treating psychiatrist was Dr. Allen Y. Masry, who submitted a detailed report to the trial court in September 2015, describing C.M.'s illness, murder of his mother, progress and setbacks throughout his time at Ancora.  Dr. Masry reported the treatment team's consensus that C.M. must demonstrate twelve incident-free months before beginning discharge planning. "When this happens, he would be re-submitted to the SSPRC/CARP and court approval sought to begin the process of seeking a group home . . . and consulting with two independent psychiatrists . . . ."

By May 2017, the treatment team again recommended planning for C.M.'s discharge to CODI, a group home.  Dr. Masry submitted another report to the trial court, stating that "for at least the last 12 years no issues with med non adherence and since 1983 no issues with suicide attempt."  The report explained

that CODI had around-the-clock supervision and mandatory curfews, with an average of one staff member per every five clients, but that staff could not technically keep clients in the home against their will. Dr. Masry assured the court, "The staff[] are trained mental health professionals who have extensive experience in how to encourage a client to stay," and "should a client not return or still choose to leave they would immediately inform authorities."

Dr. Masry also reported that CODI practices "observed medication administration." This meant that staff members administer a client's medication for the first thirty days after admission to CODI; thereafter, the patient is supplied with a week's worth of medication; a supervisor observes the client place the medication in his pillbox and checks the pillbox at week's end. However, staff would continue to administer C.M.'s anti-psychotic medication intravenously every month. CODI clients attend a day program off premises from morning until late afternoon, then return to the home, where they participate in group and individual therapy. The report reiterated that C.M. "is ready for discharge planning. The entire treatment team believes patient has reached maximum benefit with hospitalization." Dr. Masry also reported that the SSPRC and CARP had both approved the discharge.

A-2631-17T3

In September 2017, C.M.'s new psychiatrist, Dr. Shujaat Nathani – who succeeded Dr. Masry – submitted a report recommending discharge to CODI. He recounted staff reports from the group home where C.M. had visited on day passes during June 2017. The group home staff reported C.M. "was very pleasant," told staff members he "was looking forward to living in the community," while noting "he was nervous but willing to give it a chance." They reported C.M. met his roommate "and appeared to be very comfortable with him. They talked and shared stories about themselves."

On C.M.'s second visit, the group home staff reported, he seemed more relaxed and socialized with residents at the home. He appeared "fully oriented," showed "logical thinking and clear and appropriate thought content" and "described willingness to adhere to medication orders and program guidelines." C.M. also communicated openly about his experience in Ancora "and the crime he committed to be hospitalized." Dr. Nathani followed up with a second report in December 2017, which reproduced Dr. Masry's May 2017 report nearly verbatim and recommended discharge to CODI. Neither of Dr. Nathani's reports included C.M.'s clinical history or any details of his past lapses and future risks for non-compliance with medication.

A-2631-17T3

The sole witness at the <u>Krol</u> hearing in December 2017, Dr. Nathani testified about C.M.'s progress, the conditions of CODI, and C.M.'s past infractions. However, while he stated he had reviewed Dr. Masry's reports, Dr. Nathani could not identify the crime for which C.M. had been initially committed. Though the State's counsel pressed him, he could not recall – until counsel reminded him – that C.M. had murdered his own mother.

Although the State had called Dr. Nathani as a witness, at the close of his testimony, the assistant prosecutor renewed a request that the court appoint an independent psychiatrist to examine C.M. The court did not rule on the renewed request. In summation, the prosecutor challenged Dr. Nathani's opinion, and objected to C.M.'s discharge, contending the community facility was "not secure enough to ensure the safety of the community" and C.M. lacked prior experience in his own medication management.

C.M.'s attorney urged the court to approve C.M.'s discharge. Counsel argued, based on the opinions of both Dr. Masry and Dr. Nathani, that C.M. was no longer a danger to himself or others, noting the absence of violent conduct in recent years, and the persistence in his system of his medication even if he temporarily stopped taking it.

A-2631-17T3

In his oral decision, the trial judge announced that he found Dr. Nathani's testimony incredible and unhelpful, since the doctor could not recall C.M.'s initial offense and the court could find "no basis for . . . his opinion that's been put into the record."[2] The trial judge therefore concluded that "the status quo will remain in effect." The court issued a written order in January 2018, stating that it found C.M. remained a danger to himself and others and requiring his continued hospitalization, while ordering "discharge planning at the recommendation of Dr. Nathani and the team, which shall include specific details as to placement, therapy, and medications."

## II.

Aside from questions of law, which we review de novo, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), our scope of review of a commitment or recommitment order is "extremely narrow." State v. Fields, 77 N.J. 282, 311 (1978). We accord "the utmost deference . . . [to] the reviewing judge's determination as to the appropriate accommodation of the competing interests of individual liberty and societal safety in the particular case." Ibid. We have the "responsibility to canvass the record inclusive of the

---

[2] Though the trial court did not elaborate on this statement, it apparently meant to highlight the lack of detail in Dr. Nathani's written report, which omitted C.M.'s clinical history and risks.

A-2631-17T3

expert testimony to determine whether the findings made by the trial judge were clearly erroneous." In re J.M.B., 395 N.J. Super. 69, 90 (App. Div.), aff'd, 197 N.J. 563 (2009). We will modify a commitment order "only if the record reveals a clear mistake." In re D.C., 146 N.J. 31, 58 (1996).

Nonetheless, we will overturn a ruling that is "so wholly insupportable as to result in a denial of justice," Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div.), aff'd o.b. 33 N.J. 78 (1960), or is based on an "obvious overlooking or underevaluation of crucial evidence," State v. Johnson, 42 N.J. 146, 162 (1964). We will also reverse where the trial court fails to explain the reasons for its decision. See Curtis v. Finnean, 83 N.J. 563, 569-70 (1980); R. 1:7-4(a).

The State may commit individuals found not guilty by reason of insanity (NGI) so long as they pose a danger to themselves or others. In re W.K., 159 N.J. 1, 2 (1999). Commitment aims not to penalize but "to protect society against individuals who, through no culpable fault of their own, pose a threat to public safety." Krol, 68 N.J. at 246. A trial court determining the propriety of commitment must evaluate whether the NGI acquittee poses "a substantial risk of dangerous conduct within the reasonably foreseeable future," considering both the likelihood and seriousness of dangerous conduct. Id. at 260. Dangerousness to oneself or others includes risk of death, serious bodily injury,

or serious property damage. N.J.S.A. 30:4-27.2(h), (i). The State does not satisfy its burden by raising the mere possibility that an individual might become dangerous at some future point. Krol, 68 N.J. at 260.

Once committed, NGI acquittees have a right to periodic reviews – known as Krol hearings – generally "under the same standards as those applied to civil commitments" to determine the ongoing need to commit. In re M.M., 377 N.J. Super. 71, 76 (App. Div. 2005), aff'd o.b., 186 N.J. 430 (2006). "[T]he [S]tate must bear the burden of proving the necessity of recommitment, just as it bears the burden of proving the necessity for commitment." Fields, 77 N.J. at 300 (quoting Fasulo v. Arafeh, 378 A.2d 553, 557 (Conn. 1977)). However, one important exception is "that the burden of establishing the need for continued commitment is by a preponderance of the evidence, whereas in a civil commitment proceeding it is by clear and convincing evidence." W.K., 159 N.J. at 4; N.J.S.A. 2C:4-8(b)(3) (establishing preponderance-of-the-evidence standard of proof).

The regularity of Krol hearings is designed to facilitate continuous reevaluation of the status quo. Matter of Newsome, 176 N.J. Super. 511, 516 (App. Div. 1980). A trial court must therefore draw factual conclusions about a committee's current degree of dangerousness, based on "history, recent behavior

and any recent act, threat or serious psychiatric deterioration."  N.J.S.A. 30:4-27.2(h).  While the court may "give substantial weight" to past crimes and their "relationship to [a committee's] present mental condition," the court's ultimate task is "prediction of [the committee]'s future conduct rather than mere characterization of his [or her] past conduct."  Krol, 68 N.J. at 260-61.  A committee's "criminal act, while certainly sufficient to give probable cause to inquire into whether he is dangerous, does not, in and of itself, warrant the inference that he presently poses a significant threat of harm, either to himself or to others."  Id. at 247.

A trial court determining dangerousness should consider expert opinion.  Id. at 261.  However, it should not entirely defer to psychiatric assessments, because the issue of dangerousness, as a factor in the "delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy," is ultimately legal, not medical.  Ibid.  Though "[d]oubts must be resolved in favor of protecting the public, . . . the court should not, by its order, infringe upon defendant's liberty or autonomy any more than appears reasonably necessary to accomplish this goal."  Ibid.; see also State v. Ortiz, 193 N.J. 278, 292 (2008).

Applying these principles to the facts before us, we conclude that the trial court's factual findings – which relate only to Dr. Nathani's credibility but not to C.M.'s condition – are insufficient to support the recommitment order. Also, the court erroneously shifted the burden of proof to C.M., and it failed to consider the full record. Although the trial court's order stated that C.M. "continues to be a danger to himself and to society, for the reasons stated on the record," the record reveals no such reasons. The court made its single factual finding immediately following Dr. Nathani's testimony; however, it did not reference C.M.'s dangerousness, only the court's impression of Dr. Nathani's testimony:

> It really doesn't matter [whether Dr. Nathani is qualified as an expert witness], because . . . I'm familiar with Dr. Masry. Over the several times he was here, I caused him and required him to make more detailed reports, and apparently, he didn't pass that information onto his successor doctor, because even though . . . Dr. Nathani may be an expert, I find his opinion to be a net opinion. There's been no basis for . . . his opinion that's been put into the record. And frankly, I'm shocked that he didn't know the reason the defendant was there for murder. I don't believe that he remembered it at all. I don't think he even knew it, frankly, based on the manner in which he testified. . . . <u>I find his opinion to be a net opinion, and therefore, not convincing . . . to this Court in any degree whatsoever. Therefore, the status quo will remain in effect.</u>
>
> [(Emphasis added).]

The trial judge based his decision on the following premises: (a) Dr. Nathani's testimony was not credible, in part because he did not know C.M. was originally committed after murdering his own mother; (b) Dr. Nathani's opinion was unavailing because it was "net," meaning it lacked a supporting basis in the record; and (c) therefore, the status quo must remain in effect.

While we defer to the trial court's appraisal of Dr. Nathani's credibility, its limited finding regarding the expert's testimony does not support the conclusion that C.M. remains dangerous. The court neither expressly addressed whether C.M. remains dangerous nor recited facts pertinent to that issue. Conceivably, the court could have based a dangerousness finding on evidence suggesting that C.M. would not comply with his medication, but the court did not. Instead, the trial court stated only its conclusions regarding Dr. Nathani's testimony, without addressing C.M.'s dangerousness, the essential issue. Therefore, the findings the trial court announced did not support finding C.M. dangerous.

In addition, the trial court erred in presuming the status quo must continue absent evidence to the contrary. Instead of requiring the State to meet its burden of showing by a preponderance that C.M. is still so dangerous as to require

17

confinement, the trial court, by implication and in effect, burdened C.M. with the obligation to prove commitment is no longer warranted.

Finally, the trial court apparently failed to consider the full record, particularly reports by Dr. Masry recommending C.M. be considered for discharge. Dr. Masry's reports did not suffer from the shortcomings the court identified in Dr. Nathani's report and testimony. Dr. Masry set forth the basis for his opinions, and he was well aware that C.M. had murdered his mother. Dr. Masry's first report, from 2015, set forth C.M.'s entire history at length, detailing both progress and setbacks and accounting for C.M.'s murder of his mother and past attempts at self-harm. Dr. Masry concluded his assessment by stating that C.M. still suffers from mental illness and borderline intellectual functioning, and he remains at risk of violence if not medicated and of being exploited. Noting that C.M. has "adequate insight" into his illness, "fair insight" into his need for medication, and "poor judgment" about possessing contraband, Dr. Masry recommended a year-long trial period before discharge planning.

Dr. Masry's second report, from 2017, did not rehash C.M.'s history. Instead, it began by noting that C.M.'s last suicide attempt was in 1983; his last statement about self-harm was in 1993; and his last non-compliance with his medication regimen was in 2004, "a one-time incident." The report then

A-2631-17T3

described the CODI group home requested for C.M., explaining its policies on supervision, dispensing medication, and other issues. Dr. Masry stated that he, C.M.'s treatment team, the SSPRC and CARP all agreed that C.M. "is ready for discharge planning." In the meantime, Dr. Masry recommended, among other steps, allowing C.M. brief supervised visits followed by random drug screening, and that until court approval, C.M. should continue hospitalization and regular Krol hearings. In sum, avoiding the problems in Dr. Nathani's opinion, Dr. Masry recommended a measured approach towards discharging C.M. to the group home after concluding he had received all that Ancora could provide him. The court's failure to address Dr. Masry's reports also warrants reversal.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2631-17T3